UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| RANBIR GUJRAL, and DANIELLE EMERSON on behalf of themselves and the Putative Class,<br><br>            Plaintiffs,<br><br>            v.<br><br>BMW OF NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT,<br><br>            Defendants. | Case No.<br><br><br>            Civil Action<br><br>CLASS ACTION COMPLAINT AND JURY DEMAND |

Plaintiffs, by their attorney, Nagel Rice LLP, and Joseph Santoli, on behalf of themselves and all others similarly situated, make the following allegations on personal knowledge and information and belief:

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this action for actual damages, equitable relief, including restitution, injunctive relief, and disgorgement of profits, and all other relief available on behalf of themselves and all similarly-situated individuals and entities (the "Class") who own, lease or have owned or have leased BMWs which contain defective battery cable connectors which may result in the battery connector cable in the trunk coming loose over time, and, on occasion, overheating and catching fire (herein "Battery Cable Defect"). Numerous vehicles are impacted by this defect, as

BMW has over time issued recalls and then expanded the recalls to encompass ever more models and model years. However, the affected vehicles also include models which have never been recalled but which have exhibited the Class Defect (hereinafter, the "Class Vehicles"). All of the Class Vehicles have been manufactured and/or sold by the Defendants, BMW of North America, LLC ("BMW-NA") and Bayerische Motoren Werke Aktiengesellschaft("BMW-AG")(hereinafter collectively, "BMW" or "Defendant"). Counsels' investigation, including a review of NHTSA's complaint database, and communications with BMW owners, suggests that Defendant's several recalls do not capture all of the defective vehicles which suffer from the same or substantially similar battery cable defects as the recalled vehicles.

2. All of the claims asserted herein arise out of BMW's design, manufacture, and warranting of the Class Vehicles, as well as BMW's advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles as one of the most dependable, safe, and reliable vehicles available. Indeed, BMW touts itself as the manufacturer of "the ultimate driving machine." In this case, class members have been left with a machine that may stop running without warning, or worse, may go on fire without warning, resulting in an extreme safety risk to the owner, the vehicle and the surrounding property!

3. This Battery Cable Defect is inherent in the design and/or manufacture of the Class Vehicles. As a result of the Battery Cable Defect, Plaintiffs and the other members of the Class have been subject, and continue to be subject, to a serious safety risk which can occur at any time.

4. Defendant knew or should have known before the time it sold the first Class Vehicle, that the Class Vehicles contained the Battery Cable Defect.

5. The Battery Cable Defect exposes drivers and occupants of the Class Vehicles, as well as others who are near the Class Vehicles when they catch fire, to an increased risk of accident, injury, or death.

6. Defendant concealed from and/or failed to disclose to Plaintiffs, the other members of the Class and all others in the chain of distribution, the Battery Cable Defect, and failed to remove the Class Vehicles from the marketplace or take appropriate remedial action, even after BMW learned the precise cause of the Battery Cable Defect. Instead, Defendant sold and serviced the Class Vehicles, and continue to sell and service the Class Vehicles, even though it knows and knew, or was reckless in not knowing, that the Class Vehicles contained the Battery Cable Defect, and that such failure would ultimately result in the inability of Plaintiffs and the other members of the Class to use their vehicles for their intended purpose during the time

Plaintiffs and the other members of the Class reasonably expected they would have use of their vehicles, and subjected Plaintiffs and the other members of the Class to an increased risk of accident, injury, or death.

7.    Had Plaintiffs and other members of the Class known of the Defect at the time of purchase or lease, they would not have bought or leased their vehicles, or would have paid substantially less for them.

8.    Back in 2012, as reported on CBS News, https://www.cbsnews.com/news/bmw-recalls-13-million-cars-for-faulty-battery-cable/ BMW recalled 1.3 million cars worldwide due to a problem with a battery cable cover in the trunk. That recall affected 5 and 6 Series BMWs built between 2003 and 2010, according to BMW. BMW indicated that in rare cases the battery cable cover in the boot (trunk) may be incorrectly mounted, which "can result in the electrical system malfunctioning, the vehicle failing to start and, in some cases, to charring or fire," according to BMW as reported by CBS news. That recall, campaign 12V-126, impacted 368,000 cars in the United States, 293,000 cars in Germany, 109,000 cars in Britain and 102,000 cars in China.

9.    It was reported that BMW was penalized by the National Highway Traffic Safety Administration for not reporting defects fast enough once they were discovered. It was reported that BMW

originally found out about this issue in 2006 but it took time for them to uncover the source of the problem.

10.  The problem was described as involving the bolt connecting the positive battery cables at the insulated bulkhead connector in the vehicle's trunk. The positive battery cable routed from the battery in the trunk to the engine compartment consists of one cable in the trunk and a separate cable at the vehicle's underbody. The two cables are connected via a bolt connection in the vehicle's trunk. The bolt connection is secured to the trunk floor panel by an insulated bulkhead connector which was incorrectly attached to the trunk floor panel or which can come lose over time. If the bolt connection becomes loose, an increase in electrical resistance at the cable connection could occur and may overheat; alternatively, humidity can accumulate at this location causing current leakage and increasing the possibility of an overheat condition. The overheating could lead to smoldering of the floor mat that could lead to a fire in the trunk area, even if the ignition is in the off position.

11.  After the initial recall, in 2013 BMW conducted another Safety Recall for Model Year 2007-2012 BMW 1 Series, 3 Series and Z4 models with respect to the plug-in contact of the positive battery cable which transfer power from the battery located in the trunk to the fuse box, located behind the glove compartment. BMW did not specifically reference a fire risk in this recall, but

merely advised that the vehicle may not start or could stall. Then, in June 2018 BMW further expanded the recall to include more than 6,500 model year 2010 and 2011 BMW 335d models.  In Recall 18V-314, BMW reported that the plug in contact of the positive battery cable at the front of the power distribution box may be damaged by vehicle vibrations. However, the problems were still not resolved. In 2016, there was a service action for 2009-2011 M3 models.

12. Most recently, in June 2019 yet another safety recall, 19V-472, was issued with respect to an additional 16,641 vehicles regarding the positive battery cable connections because of a tin coating. This recall included 2009 328i and 328xi station wagons, 2009-2011 335D 4 door diesels, 2008-2012 M3 Coups and M3 Convertibles, and 2008-2011 M3 Sedans.

13. Both Plaintiffs Gujral and Emerson experienced catastrophic fires emanating from their trunks where the recalled cable connectors are located, but neither received a recall notice to bring their vehicles in for replacement of the battery cable connectors.

14. Plaintiffs and the Class have suffered an ascertainable loss as a result of Defendant's omissions associated with the Battery Cable Defect, including but not limited to, out of pocket losses and diminished value of the Class Vehicles.

15. Were Plaintiffs and the other Class members aware of the concealments, failures to disclose and omissions described herein,

they would not have purchased their vehicles or would have paid significantly less for them.

16.  Plaintiffs seek actual damages, injunctive relief, restitution and/or disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to Plaintiff and the Class.

## II.  PARTIES

17.  Plaintiff Randbir Gujral is a Connecticut citizen who resides in Hartford, Connecticut.

18.  Plaintiff Danielle Emerson is a North Carolina citizen who resides in Charlotte, North Carolina.

19.  Defendant BMW of North America, LLC ("BMW-NA"), is a limited liability company, organized and in existence under the laws of the state of Delaware with corporate headquarters located at 300 Chestnut Ridge Road, in Woodcliff Lake, New Jersey. BMW is the distributor and warrantor of the Class Vehicles in the United States.

20.  Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW-AG") is a duly organized German corporation with its headquarters in the city of Munich, Germany.  BMW-AG is the parent company of BMW-NA.

21.  At all relevant times, Defendant was engaged in the business of marketing, advertising, distributing, selling, and warranting automobiles, other motor vehicles and motor vehicle

components in New Jersey and throughout the United States of America. BMW-NA sells and distributes vehicles that it manufactures, as well as vehicles manufactured by BMW-AG and has a network of more than 338 independently-owned dealerships throughout the USA. BMW-NA drafted and published the owner's manual and Service and Warranty Information materials and acts as the warrantor of vehicles constructed by both Defendants which are sold in the USA.

22.    There exists at all times relevant hereto, a unity of ownership between BMW-NA, BMW-AG and their agents, such that any individuality or separateness between them has ceased and each is the alter ego of the other. BMW-AG communicates with BMW-NA concerning virtually all aspects of the products distributed within the USA.

### III. <u>Plaintiff's Experience</u>

23.    In September or October of 2013, Mr. Gujral purchased a 2013 BMW 328xi VIN:WBA3B5C55DF597867 from BMW of North Haven at a purchase price of approximately $36,000. At the time of purchase the car had been used by the dealer as a loaner and had been driven only 7,000 miles so it was still under warranty. Gujral regularly had all suggested maintenance performed by BMW of Bridgeport.

24.    In deciding to purchase this BMW, Mr. Gujral relied upon advertisements and other marketing materials touting the high quality, and outstanding safety record of the BMW brand.

25.   It was not disclosed to Gujral that his vehicle contained the Battery Cable Defect. Had BMW disclosed that this vehicle contained the Battery Cable Defect, he would not have purchased the vehicle, or would have paid significantly less for the vehicle.

26.   Gujral did not receive any recall notices for his vehicle.

27.   On April 12, 2017, a week after his warranty expired, Gurjal's vehicle suffered a catastrophic fire. He had last driven the car at approximately 9:30 p.m. when he parked the car, next to the 2004 Acura he also owned, at the parking lot of the Orange Landing Condominiums, in West Haven, where he resided. After he went to bed for the night, at approximately 2:30 a.m., he heard someone knocking on his door and it was his upstairs neighbor telling him that his car was on fire. By the time he put on his shoes and ran to the parking lot the Fire Department had already arrived.   His car had not been driven for several hours before the fire.

28.   An examination at the scene conducted by the West Shore Fire District concluded that the area of origin of the fire was the trunk compartment of the BMW 328XI in the vicinity of the passenger side, or right side of the trunk. The Chief of the West Shore Fire Department/Fire Marshall reported that: "The exterior of the vehicle had had no fire damage to the front hood, grill, and front fenders. Heat and fire damage to the roof. The trunk and

rear quarter panels sustained the most exterior fire damage melting away all plastic parts in this area. Also the paint was burned away in this area leaving bare metal. The engine compartment of the vehicle was intact with no fire damage observed and was eliminated as potential source of ignition of this fire. The windshield sustained heat and smoke damage and was broken at the top center due to heat. The interior of the vehicle sustained fire and heat damage the least amount toward the front and more to the rear of the vehicle. The trunk was opened on arrival by the Fire Department during suppression operations. The trunk sustained the most fire damage and heavy heat damage. The underside of the trunk lid sustained fire and heat damage indicating that the trunk was closed during the fire. The carpet and electrical components including the vehicles battery sustained fire and heat damage, the rear portion of the trunk contained many electrical components." The Fire Marshall further reported that: "The Canine Accelerant Detection Team was called in to assist and the Canine yielded negative results for the presence of ignitable liquids."

29.  Gujral's 2004 Acura, which was parked right next to his BMW, also sustained fire damage to the right side lower rear quarter panel because the fire had extended from the trunk area of the BMW 328XI.

30.  State Farm declared the BMW a total loss. In addition to damage to the Acura, Gujral lost an expensive pair of sunglasses

and the cost of an extended warranty, not to mention the inconvenience of having to purchase another car.

31.  BMW merely offered Gujral a customer loyalty payment towards another BMW upon learning of the fire.

32.  At all times, Gujral, as did other members of the Class, drove their vehicles in a foreseeable manner, and in the manner in which they were intended to be used.

33.  In February 2015 Plaintiff Danielle Emerson purchased a certified pre-owned 2011 BMW 528I, VIN WBAFR1C55BC746388 with approximately 40,000 miles from CarMax in Charlotte, North Carolina paying approximately $32,000 for the vehicle.

34.  She purchased the vehicle because she believed that BMWs were safe, reliable, high performance cars, based upon her exposure to BMW's advertising.

35.  On July 27, 2015, after driving the vehicle for five months and putting just a little over 2,000 miles on it, Emerson experienced a catastrophic vehicle fire. At that time, the vehicle had a mere 42,868 miles on it.

36.  At approximately 10:00 p.m., Plaintiff Emerson picked up her daughter from work about two miles from home. She filled up her gas tank, and parked her car in her two-car garage closing the garage door. At approximately 1:00 a.m. she heard the garage door open and the smoke alarm started to sound. She came downstairs and observed a smoky condition. She got everyone out of the house and

saw that the garage was on fire. Emerson and her son hooked up the hose and extinguished the fire, which appeared to be coming from under the BMW on the passenger side. Her son sustained injury putting out the fire. Emerson filed a claim with her homeowners insurance for the Camry, the other car which was in the garage at the time of the fire which sustained damage, and for the BMW which was declared a total loss. State Farm paid off the BMW and the fire was reported to the Fire Department. As a result of the fire, Emerson sustained smoke damage inside her home, requiring the replacement of many items of furniture, as well as, unreimbursed damage to her garage floor, garage door opener and ceiling as well as the destruction of a vehicle she only owned for a few months.

37.   On September 2, 2015, BMW's Product Analysis Specialist inspected Emerson's car after it was towed to Hendrick BMW in Charlotte, North Carolina. The inspection revealed thermal damage to the insulation covering the battery cable that runs between the battery in the trunk and jump connection in the engine compartment but they saw no indication of over-voltage or shorting of the wiring within. Despite the widespread knowledge of the problems with the battery cable connection, BMW concluded that "examination of the electrical, mechanical and fuel delivery systems did not reveal any indications of an ignition source as a cause of the fire." BMW refused to accept responsibility for any damage or loss associated with the "thermal event."

38.  Emerson never received a recall notice for the vehicle although she learned after the incident that other model BMWs had been recalled for defects with the battery cable connection.

#### IV.  <u>JURISDICTION AND VENUE</u>

39.  This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), as the Class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from Defendant, and seeks in the aggregate more than Five Million Dollars ($5,000,000.00), exclusive of costs and interest.  This Court also has personal jurisdiction over the parties because Defendant conducts substantial business in New Jersey, its corporate headquarters is located in New Jersey, and has had systematic and continuous contacts with New Jersey, and has agents and representatives that can be found in this State.

40.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant BMW-NA is a citizen of this judicial district, a substantial part of the events giving rise to the claims set forth herein occurred and emanated from this district, and Defendant's conduct has injured members of the Class residing in this district. Accordingly, this Court has jurisdiction over this action, and venue is proper in this judicial district.

## V. <u>NEW JERSEY LAW APPLIES</u>

41. It is appropriate to apply New Jersey law to the nationwide claims because New Jersey's interest in this litigation exceeds that of any other state.

42. New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause of the 14th Amendment, Section 1, and the Full Faith and Credit Clause, Article IV, Section 1 of the United States Constitution. New Jersey has significant contacts to the claims asserted by Plaintiff and all Class members, and thereby creates state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

43. BMW-NA headquarters is located in New Jersey and is the sole entity in the contiguous 48 states of the U.S. responsible for distributing, selling, leasing and warranting BMW vehicles.

44. The Woodcliff Lake facility handles customer relations, engineering, marketing, the warranty department and the technical training center. Customer complaints are fielded from New Jersey as is the monitoring of consumer complaints posted to both BMW and third party web-sites.

45. BMW's warranty and engineering departments are responsible for concealing the Battery Cable Defects from Class members and for instituting policies to deny warranty coverage to

those who experience engine failure caused by the Battery Cable
Defects.

46. BMW has a vehicle preparation center in Port Jersey, New
Jersey where BMW inspects and prepares vehicles for distribution
throughout the United States.

47. BMW owns property in New Jersey, conducts substantial
business in New Jersey and avails itself of New Jersey's laws.
BMW's SAV Center Agreement expressly provides that it is to be
construed under New Jersey law. Thus New Jersey has an interest in
regulating Defendant's conduct under its laws rendering the
application of New Jersey law to all claims asserted herein to be
constitutionally permissible.

## VI. <u>TOLLING OF STATUTE OF LIMITATIONS</u>

48. Any applicable statute(s) of limitations has been tolled
by BMW's knowing and active concealment and denial of the facts
alleged herein. Despite their due diligence, Plaintiff and the
other members of the Class could not have reasonably discovered
the Battery Cable Defects due to the technical nature of the class
vehicle design and manufacturing defects, including materials and
workmanship.

49. BMW was and remains under a continuing duty to disclose
to Plaintiff and the other members of the Class the true character,
quality and nature of the Battery Cable Defect, that the Battery
Cable Defect poses safety concerns, and that the Battery Cable

Defect diminishes the resale value of the Class Vehicles. As a result of the active concealment by BMW, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

50. Moreover, because the Battery Cable Defect could not be detected due to BMW's purposefully fraudulent concealment, Plaintiff and the other members of the Class were not reasonably able to discover the Battery Cable Defect until long after purchasing or leasing the Class Vehicles, despite their exercise of due diligence. Thus, the discovery rule is applicable to the claims asserted by Plaintiff and the other members of the Class.

51. Any applicable statute of limitation has therefore been tolled by BMW's knowing, active concealment and denial of the facts alleged herein. BMW is estopped from relying on any statutes of limitation because of its concealment of the Battery Cable Defect.

### VII. FACTUAL BACKGROUND

#### A. The Reasonable And Legitimate Expectations Of Plaintiff And The Members Of The Putative Class

52. Customers purchasing or leasing vehicles reasonably and legitimately expect that those vehicles, like the Class Vehicles at issue herein, will properly and safely function for years.

53. In purchasing or leasing their vehicles, Plaintiff and the other members of the Class reasonably and legitimately expected their vehicles to be reliable, and to operate in

accordance with all of their intended purposes – including not bursting into flames.

54.   In purchasing or leasing their vehicles, Plaintiff and the other members of the Class reasonably and legitimately expected that the Class Vehicles would be free from the Battery Cable Defect, as well as the stalling and failure to start that may occur as a result of the Battery Cable Defect and the fire damages posed by the Battery Cable Defect.

55.   The existence of the Battery Cable Defect is a fact that would be considered material to a reasonable consumer deciding whether to purchase or lease an expensive BMW vehicle.

56.   Customers like Plaintiff and the other members of the Class, reasonably and legitimately expect and assume that a vehicle's battery connections will function in its intended manner, will not pose a safety hazard, and is free from defects. Plaintiff and the other members of the Class also reasonably and legitimately expect and assume that Defendant will not sell or lease vehicles with a known defect, will disclose any such defects to consumers when they learn of them, and take all steps to remedy any defect in a manner that does not cause additional cost to the customer.

57. It was reasonable and legitimate for Plaintiffs and the other members of the Class to expect BMW not to actively and intentionally conceal problems from them – such as the Battery

Cable Defect described herein, and to deny the existence of these defects for years after becoming aware of the problems.

58. It was reasonable and legitimate for Plaintiffs and the other members of the Class to expect that BMW would issue a recall and stock the necessary parts to make the repairs. However, BMW failed to include plaintiffs in prior recalls for this defect or notify plaintiffs of the Battery Cable Defect during which time Plaintiffs and other Class members, experienced the Battery Cable Defects.

59. Throughout the period that the Class Vehicles were sold and leased, BMW marketed, promoted and advertised the Class Vehicles as reliable, safe, fuel efficient and "the ultimate driving machine."

60. Plaintiff and the other members of the Class reasonably and legitimately expected BMW to disclose the existence of the problems with the battery cable connections and that the Class Vehicles were at risk of catching fire that were known to BMW at the time of sale or lease, or when the Class Vehicle were brought in for repairs.

61. Plaintiff and the other members of the Class could not have discovered the latent Battery Cable Defects through any reasonable inspection of their vehicles prior to purchase or at any time thereafter.

62. As a consequence of BMW's exclusive knowledge and concealment about the Battery Cable Defects, BMW owners and Class members will not discover the problem until after warranty coverage has passed.

63. Had Plaintiff and other members of the Class known about the Battery Cable Defects while they were in the market for purchasing or leasing a vehicle, they would not have purchased or leased the Class Vehicles or, at the very least, would have paid less for them particularly due to the increased risk of accident, injury or death.

B.    The Battery Cable Defects and Defendant's Awareness Of These Defects

64. Plaintiffs allege that at all relevant times, specifically at the time they purchased or leased their vehicles and when their vehicles were brought in for service, Defendant knew or should have known of the Battery Cable Defect and the safety dangers of the Battery Cable Defect. BMW was under a duty to disclose the Battery Cable Defect based upon its exclusive knowledge of and/or concealed material information regarding the Defects; BMW failed to disclose the Battery Cable Defect to Plaintiff, other Class members, or the public at any time or place or in any manner such that it could (and would) have affected Plaintiff's and other Class members' pre-sale decision to purchase and/or lease the Class Vehicles.

65. Although BMW belatedly reported to the NHTSA that it was undertaking a recall with respect to the Class Vehicles, BMW knew there was a problem with the battery cable connections as early as 2006. Over time, more and more models and years were recalled due to issues with a battery cable but many of the Class members who experienced vehicle fires emanating from the trunk of their vehicle were never included in any of the recalls. Further, when these fires occurred, BMW would refuse to accept responsibility, claiming they could not determine the cause of the fire.

66. In the most recent recall, the defect is once again described as involving the vehicle power supply system. "On affected vehicles, the battery is located in the trunk of the vehicle. Power is transferred, via a positive battery ("B+") cable, from the battery in the vehicle's trunk to the fuse box which is located between the glove compartment and the dash panel inside the vehicle. The connector at the end of the B+ cable and the corresponding terminal on the fuse box are both coated with tin. In addition, affected vehicles contain a plastic or metal support bracket at the fuse box. If relative movements between the B+ cable connector and the terminal on the fuse box occur, then in combination with very high current flow, the connection may be susceptible to fretting over time. Depending upon the extent of the degradation of the connectors, variations in the

electrical resistance at this connection could occur. With high current flow, increased heat on the connectors could be present and lead to further wear of the connectors." The safety risk is described as "excessive wear of the connectors could eventually lead to a break in the electrical connection and create a non-starting condition in the vehicle. Also a strong variation in the contact resistance could lead to a momentary shut down. In an extreme case the electrical system may be completely interrupted during vehicle operation resulting in a complete loss of vehicle power and could increase the risk of a crash."

67. This latest recall report refers to BMW's February 7, 2013, amended July 26, 2013, and May 14, 2019 reports assigned Recall IDs 13V-044 and 18V-314 respectively. Vehicles added by the newest recall contain a metal support bracket at the fuse box, except for vehicles containing a plastic support bracket which were part of the 2016 service action. After the 2018 recall BMW met with the NHTSA to discuss the earlier recalls and claimed they were not aware of any field incidents involving vehicles equipped with the metal support bracket at the fuse box, but apparently in May 2019 BMW Canada met with Transport Canada and learned of five customer complaints that were not included in the prior recall, including an occurrence during vehicle operation, so it was decided that the problem could occur with vehicles having the

metal support bracket and a voluntary recall including the additional models was conducted.

68. The knowledge of the Battery Cable Defect by BMW-NA is imputable to BMW-AG because the former was monitoring warranty claims and Class Vehicle performance in the United States and reporting back to the parent company in Munich.

C. __BMW's Warranty__

69. BMW issued warranties to each owner or lessee of the Class Vehicles.

70. Under these warranties, BMW warrants against "defects in materials or workmanship" for four years or 50,000 miles.

71. BMW instructs owners and lessees to bring their vehicles to a BMW dealership for warranty repairs.

72. BMW has evaded its warranty obligations by failing to inform all owners and lessees of the Class Vehicles of the existence of the Battery Cable Defect.

73. In many if not most instances the Battery Cable Defect does not manifest until after the expiration of the warranty and BWM is well aware of this fact. However, all Class Vehicles were sold or leased to Class members with the defective components thereby breaching the warranty to Plaintiff and the Class members.

74. Plaintiff and the Class members reasonably relied upon BMW representations regarding its warranty and the safety of the

Class Vehicles. BMW omitted from all its advertising and marketing materials that the Class Vehicles had the Battery Cable Defect.

## VIII. <u>CLASS ACTION ALLEGATIONS</u>

75. Plaintiffs bring this action on behalf of themselves and all other persons similarly situated, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclass (collectively, the "Classes"):

<u>The Nationwide Class</u>

All persons or entities in the United States who own, lease, or have owned or have leased, a Class Vehicle and who sustained monetary loss and/or diminution of class vehicle value resulting from the defendant's conduct as described in this complaint (hereinafter "proposed class members" or "class members" or "the Nationwide Class").

<u>The Connectcicut Subclass</u>

Connecticut residents who formerly or currently own or lease one or more of the Class Vehicles and who sustained monetary loss and/or diminution of class vehicle value resulting from the defendant's conduct as described in this complaint (hereinafter "proposed Connecticut class members" or "the Connecticut subclass").

<u>The North Carolina Subclass</u>

North Carolina residents who formerly or currently own or

lease one or more of the Class Vehicles and who sustained monetary loss and/or diminution of class vehicle value resulting from the defendant's conduct as described in this complaint (hereinafter "proposed North Carolina class members" or "the North Carolina subclass").

### Fire Subclass

All persons or entities in the United States who own, lease, or have owned or have leased, a Class Vehicle and have experienced a fire in their vehicle and sustained monetary loss and/or diminution of class vehicle value damage relating to the Battery Cable Defect (hereinafter "proposed Fire Class Members or "the Fire subclass").

### Excluded from all Classes

Excluded from the Classes are: (a) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and successors that purchased the Vehicles; (b) the judge to whom this case is assigned and any member of the judge's immediate family; and (c) individuals with claims for personal injury, wrongful death and/or emotional distress.

76. <u>Numerosity/Impracticability of Joinder</u>: The members of the Class are so numerous that joinder of all members would be impracticable. Based upon NHTSA documents approximately 48,000 Class Vehicles were purchased or leased by Class members.

77. <u>Commonality and Predominance</u>: There are common questions of law and fact that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, include, but are not limited to, the following:

a. Whether the Class Vehicles suffer from the Battery Cable Defect;

b. Whether BMW knew, or reasonably should have known, that the Class Vehicles were defectively designed, manufactured, marketed, distributed, advertised, warranted, sold, leased, and serviced;

c. Whether BMW knew or reasonably should have known of the Battery Cable Defect before it sold and leased the Class Vehicles to Plaintiffs and the other members of the Class;

d. Whether BMW had a duty to disclose the Battery Cable Defect to Plaintiff and the other members of the Class sooner than they did;

e. Whether BMW actively and intentionally concealed, failed to disclose and/or omitted material information in its marketing, advertising, sale and lease of the Class Vehicles concerning the existence of the Battery Cable Defect;

f. Whether Plaintiff and the other members of the Class are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

g. Whether BMW violated the consumer protection laws in the New Jersey Consumer Fraud Act (hereinafter, the "CFA"), <u>N.J.S.A.</u> 56:8-1, et seq., and/or the consumer protection laws of the states involving sub-class members.

h. Whether BMW's conduct violates warranty laws, and other laws as asserted herein;

i. Whether, as a result of BMW's omissions and concealments of material facts related to the Battery Cable Defects, Plaintiff and the other members of the Class have suffered ascertainable losses, and whether Plaintiff and

the other members of the Class are entitled to monetary
damages and/or other remedies, and if so the nature of
any such relief;

j. Whether BMW's acts and/or omissions entitle Plaintiff
and the other members of the Class to treble damages,
attorneys' fees, prejudgment interest and cost of suit.

78. <u>Typicality</u>: Plaintiffs' claims are typical of the claims
of the members of the Class. Plaintiff and the other members of
the Class have suffered similar injury by the same wrongful
practices by BMW. The claims of Plaintiff and the other members of
the Class all arise from the same wrongful practices and course of
conduct, and are based on the same legal and remedial theories.

79. <u>Adequacy Of Representation</u>: Plaintiffs will fully and
adequately assert and protect the interests of the members of the
Class, and have retained class counsel who are experienced and
qualified in prosecuting class actions. Neither Plaintiff nor her
attorneys have any interests that are contrary to or conflicting
with the members of the Class.

80. <u>Superiority Of Class Action And Impracticability Of
Individual Actions</u>: A class action is superior to all other
available methods for the fair and efficient adjudication of this
lawsuit, because individual litigation of the claims of all members
of the Class is not economically feasible and is procedurally
impracticable. While the aggregate damages sustained by the
members of the Class are in the millions of dollars, and are no
less than five million dollars, upon information and belief, the

individual damages incurred by each member of the Class resulting from BMW's wrongful course of conduct are too small to warrant the expense of individual suits. The likelihood of individual members of the Class prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, BMW has acted or refused to act on grounds generally applicable to the members of the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

## IX. <u>CLAIMS FOR RELIEF</u>

### <u>FIRST COUNT -- OMISSION</u>
#### Violations of New Jersey's Consumer Fraud Act,
#### N.J.S.A. § 56:8-2, et seq.)

81.  Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

82.  This claim is brought on behalf of the Nationwide Class and Fire Subclass.

83.  BMW has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles it knew to be defective.

84.  BMW intentionally omitted the fact that its goods, merchandise and/or services did not have characteristics, uses, benefits, or quantities that were advertised and promoted, and failed to disclose that its goods, merchandise and/or services were not of a particular standard, quality or grade.

85.  BMW had a duty to Plaintiff and the Nationwide Class and Fire Subclass to disclose the defective nature of the Class Vehicles and the Battery Cable Defects because:

a. BMW was in a superior position to know the true state of facts about the Battery Cable Defect and repair costs in the Class Vehicles;

b. Plaintiff and the Nationwide Class and Fire Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had dangerous safety defects until after manifestation of the Battery Cable Defect;

c. BMW knew that Plaintiff and the Nationwide Class and Fire Subclass could not reasonably have been expected to learn or discover the Battery Cable Defect and the associated repair costs until the manifestation of the Battery Cable Defect.

86. In failing to disclose the Battery Cable Defect and the associated risks and repair costs, BMW undertook active and ongoing steps to intentionally conceal the Battery Cable Defect, and has concealed, failed to disclose and/or omitted material facts from Plaintiff and other members of the Nationwide Class and Fire Subclass with respect to the Battery Cable Defect in the Class Vehicles.

87. BMW intended that Plaintiff and the other members of the Nationwide Class and Fire Subclass would rely upon its acts of concealment and/or omission by purchasing or leasing the Class Vehicles at full price rather than paying less to purchase or lease the Class Vehicles, or purchasing or leasing other vehicles.

88. BMW intended that Plaintiff and the other members of the Nationwide Class and Fire Subclass would rely upon its acts of concealment and/or omission to avoid replacing the defective parts during the warranty period.

89.    BMW's omissions were objectively deceptive, and had the capacity to deceive reasonable consumers under the circumstances. The fact that BMW knew about and failed to disclose that the Battery Cable Defect in the Class Vehicles was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

90.    Such practices contravene the New Jersey Consumer Fraud Act, <u>N.J.S.A.</u> 56:8-1, et seq.

91.    As a direct and proximate result of BMW's violations of the NJCFA, Plaintiff and the other members of the Nationwide Class and Fire Subclass have suffered ascertainable losses, which include but are not limited to, the monies they were forced to expend to repair their vehicles or replace vehicles destroyed by fire, and accordingly were harmed by Defendant's actions in violation of the NJCFA.

<u>SECOND COUNT – OVER CHARGING</u>
(Violations of New Jersey's Consumer Fraud Act,
N.J.S.A. § 56:8-2, et seq.)

92.    Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

93.    This claim is brought on behalf of the Nationwide Class and Fire Subclass.

94. BMW has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles at a premium price despite knowing that they were defective.

95. BMW charged a premium for Class Vehicles, despite knowing that its goods, merchandise and/or services had characteristics, uses, benefits, or quantities that they did not have, and that its goods, merchandise and/or services were of a particular standard, quality or grade that they were not.

96. BMW sets the pricing for the Class Vehicles at its headquarters in New Jersey.

97. In its advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles, BMW undertook active and ongoing steps to charge a premium price for the Class Vehicles while intentionally concealing the Battery Cable Defects, and has consciously concealed, failed to disclose and/or omitted material facts from Plaintiff and other members of the Nationwide Class and Fire Subclass with respect to the Defect.

98. BMW intended that Plaintiff and the other members of the Nationwide Class and Fire Subclass would rely upon its acts of concealment and/or omission by purchasing or leasing the Class Vehicles at premium price rather than paying less to purchase or lease the Class Vehicles, or purchasing or leasing other vehicles.

99. BMW's conduct was objectively deceptive, and had the capacity to deceive and defraud reasonable consumers under the circumstances. The fact that BMW knew about and failed to disclose the Battery Cable Defects was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

100. Such practices contravene the New Jersey Consumer Fraud Act, <u>N.J.S.A.</u> 56:8-1, et seq.

101. As a direct and proximate result of BMW's violations of the NJCFA, Plaintiff and the other members of the Nationwide Class and Fire Subclass have suffered ascertainable losses, which include but are not limited to, the premium price the Nationwide Class and Fire Subclass paid for the Class Vehicles, the monies they were forced to expend — and will have to expend in the future — to repair and/or replace their vehicles, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the NJCFA.

## THIRD COUNT

### (Breach of Express Warranty)

102. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

103. This claim is brought on behalf of the Nationwide Class and Fire Subclass.

104. BMW provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

105. Accordingly, BMW warranties are express under state law.

106. The components that must be repaired and/or replaced as a result of the Battery Cable Defects, as well as the other damages caused as a result of the Battery Cable Defects, as described herein, are covered by the express warranties BMW provided all purchasers and lessors of the Class Vehicles.

107. Plaintiffs and the other members of the Nationwide Class and Fire Subclass have complied with all obligations and requirements under the Class Vehicles' express warranties, or are otherwise excused from performance of said obligations and requirements.

108. BMW breached these warranties by selling and leasing Class Vehicles which they knew, or reasonably should have known, contained the Battery Cable Defects and required repair or

replacement within and outside the applicable warranty periods, and/or refused to honor the warranties by providing free repairs and/or replacements during the applicable warranty period or periods or after the warranty expired, which is when the Battery Cable Defects typically manifested.

109. Plaintiffs notified BMW of the breach within a reasonable time, and/or was not required to do so because affording BMW a reasonable opportunity to cure its breach of written warranty would have been futile. BMW also knew of the Battery Cable Defects and yet chose to conceal it and to not comply with their warranty obligations.

110. As a direct and proximate result of BMW's breach of the Class Vehicles' express warranties, Plaintiffs and the other members of the Nationwide Class and Fire Subclass were damaged by, among other things, being forced to expend monies — and will continue to be forced to expend monies — to repair and/or replace their vehicles and diminution in value of their vehicles.

111. BMW's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, BMW's warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the Battery Cable Defects and in most instances the Battery Cable Defects do not manifest itself until after the express warranty expires.

112. The time limits contained in BMW's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Nationwide Class and Fire Subclass. Among other things, Plaintiffs and the members of the Nationwide Class and Fire Subclass had no meaningful choice in determining these time limitations the terms of which unreasonably favored BMW. A gross disparity in bargaining power existed between BMW and Plaintiffs and the Nationwide Class and Fire Subclass, and BMW knew or should have known that the Class Vehicles were defective at the time of sale.

113. Plaintiffs, and members of the Nationwide Class and Fire Subclass, have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of BMW's conduct described herein.

## FOURTH COUNT

### (Breach of Implied Warranty)

114. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

115. This claim is brought on behalf of the Nationwide Class and Fire Subclass.

116. BMW was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Vehicles. BMW knew,

or reasonably should have known, of the specific use for which the Class Vehicles were purchased or leased.

117.  BMW provided Plaintiffs and the other members of the Nationwide Class and Fire Subclass with an implied warranty of merchantability that the Class Vehicles, and any components thereof, are merchantable and fit for the ordinary purposes for which they were sold or leased.

118.  BMW impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty of merchantability included, among other things: (1) a warranty that the Class Vehicles, and the engines required for operation were manufactured, supplied, distributed, sold and/or leased by BMW were safe and reliable for providing transportation, and would not experience fire or a risk of fire and (ii) a warranty that the Class Vehicles would be fit for their intended use while the vehicles were being operated.

119.  Contrary to the applicable implied warranties of merchantability, the Class Vehicles were not fit for their ordinary and intended purpose of providing Plaintiffs and the other members of the Nationwide Class and Fire Subclass with reliable, durable, and safe transportation.

120.  Defendant breached the Class Vehicles' implied warranty of merchantability by selling or leasing Plaintiffs and the other members of the Nationwide Class and Fire Subclass, vehicles, and/or

components thereof, that are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffered from the Battery Cable Defects at the time of sale or lease rendering the Class Vehicles unfit for their particular purpose of providing safe and reliable transportation.

## FIFTH COUNT

**(Breach of Written Warranty Under the
Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*)**

121. Plaintiffs, on behalf of themselves, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

122. This claim is brought on behalf of the Nationwide Class.

123. Plaintiffs and other members of the Nationwide Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

124. BMW is a "supplier[]" and "warrantor[]" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

125. The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

126. BMW's express warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

127. BMW breached the express warranty by selling and leasing vehicles which they knew, or reasonably should have known,

contained the Battery Cable Defects and required repair or replacement within the applicable warranty periods, and/or refused to honor the warranties by providing free repairs and/or replacements during the applicable warranty period or periods.

128. BMW's breach of the express warranty deprived the Plaintiffs and the other members of the Nationwide Class of the benefits of their bargains.

129. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

130. BMW has been afforded a reasonable opportunity to cure its breach of written warranty, including when Plaintiffs and other members of the Nationwide Class brought their Class Vehicles in for regular maintenance, or diagnoses and repair of the Battery Cable Defects.

131. As a direct and proximate result of BMW's breach of written warranty, Plaintiffs and other members of the Nationwide Class sustained damages and other losses in an amount to be determined at trial. BMW's conduct damaged Plaintiff and other members of the Nationwide Class who are entitled to recover damages, consequential damages, specific performance, diminution

in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

## SIXTH COUNT

(Violation of the Connecticut Unfair Trade Practices Act "CUTPA")

132.  Plaintiff, Gujral, on behalf of himself, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

133.  Plaintiff brings this claim individually and on behalf of a Class of Connecticut residents who formerly or currently own or lease one or more of the Class Vehicles, in the event the Court declines to certify a nationwide class under New Jersey law.

134.  The Connecticut Unfair Trade Practices Act ("CUTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §42-110b(a).

135.  BMW is a "person" within the meaning of CUTPA, Conn. Gen. Stat. 42-110a(3). At all relevant times, BMW was acting in the conduct of trade or commerce as it advertises, distributes, markets and sell BMWs to consumers in Connecticut and the rest of the United States.

136.  At all relevant times, BMW was prohibited by CUTPA, Conn. Gen. Stat. 42-110a et seq., from engaging in unfair, deceptive and/or misleading acts and/or practices in the conduct of any trade or commerce.

137.   Based on the conduct alleged herein BMW engaged in unfair and deceptive acts or practices in violation of Conn. Gen. Stat. 42-110b. In the course of its business, BMW failed to disclose and actively concealed the dangers and risks posed by the Battery Cable Defect resulting from the battery cables and otherwise engaged in activities with a tendency or capacity to deceive.

138.   BMW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, misrepresentations or omissions of material facts when it knowingly advertised the Class Vehicles as being "safe" and suitable for consumers despite BMW's knowledge that the positive battery cable connector was defective. BMW was aware that the battery cable connector came loose and could degrade causing the vehicles to stall or stop or catch fire. Despite this knowledge, BMW marketed the Class Vehicles as "safe" vehicles and did not disclose to Plaintiff Gujral and the Connecticut Class that the battery cables were connected in a dangerously defective manner.

139.   Safety is a critical feature for many purchasers and lessees of automobiles, especially automobiles marketed as high performance.  Thus, BMW's misrepresentations that the Class Vehicles were "safe," and omissions and misleading statements about the Battery Cable Defect were material to reasonable consumers.

140.  BMW's acts and practices offend public policy as established by statute. BMW violated the Motor Vehicle Safety Act, 49 U.S.C. § 30101 et seq. (the "Safety Act"), by failing to promptly disclose the existence of the Battery Cable Defect to NHTSA and to the owners, purchasers and dealers of BMW Vehicles. See 49 U.S.C. § 30118(c).

141.  BMW's acts and practices were immoral, unfair, unscrupulous, oppressive and unethical, especially insofar as these acts and practices exploited the motivation of Plaintiff Gujral and the Connecticut Class to ensure the safety of themselves and their passengers, and then placed them in physical danger.

142.  BMW's acts and practices caused substantial injury to Plaintiff Gujral and Connecticut Class members because: (a) they would not have purchased the Class Vehicles, or would not have purchased them on the same terms, if the true facts concerning the Battery Cable Defect had been known; and (b) they paid a price premium due to BMW's marketing and selling of the Class Vehicles as "safe." Meanwhile, unbeknownst to them, serious injury can result from ordinary use as a result of the Battery Cable Defect in the Class Vehicles. Consumers have thus overpaid for the Class Vehicles, could not have reasonably avoided such injury and such injury is not outweighed by any countervailing benefits to consumers or competition.

143.  BMW's unfair and/or deceptive practices directly,

foreseeably, and proximately caused Plaintiff Gujral and the Connecticut Class to suffer an ascertainable loss, including overpaying for the Class Vehicles, being deprived of the use of the Class Vehicles for which they paid a premium but which are not fit for their ordinary purpose, and losing resale value.

144. This class action is specifically permitted by Conn. Gen. Stat. § 42-110g(b).

145. As a result of BMW's violation of CUTPA, Plaintiff Gujral and the other Connecticut Class members should be awarded damages, including punitive damages, in an amount to be determined at trial.

146. Plaintiff Gujral and the Connecticut Class seek to recover all relief available under the statute, including but not limited to any equitable relief available and reasonable attorneys' fees and costs incurred in connection with this action.

## SEVENTH COUNT

**(Breach of Express Warranty under Connecticut law)**

147. Plaintiff, Gujral, on behalf of himself, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

148. Plaintiff brings this claim individually and on behalf of a Class of Connecticut residents who formerly or currently own or lease one or more of the Class Vehicles, in the event the Court declines to certify a nationwide class under New Jersey law.

149.   BMW expressly warranted that the Class Vehicles were of high quality, were safe, and would work properly. It also expressly warranted that it would repair and/or replace defects in material and/or workmanship free of charge while the vehicle was within warranty.

150.   Plaintiff Gujral and members of the Connecticut Class relied on these express warranties when choosing to purchase or lease their Class Vehicles.

151.   BMW has breached these warranties because the Class Vehicles are not of high quality, are not safe, and do not work properly, insofar as the Vehicles are sold with the Battery Cable Defect.

152.   In addition, BMW, on one hand, and Plaintiff Gujral and other members of the Connecticut Class, on the other, have entered into certain written warranties. The basic warranty "covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by BMW," and lasts for 5 years or 40,000 miles. This warranty, by its terms, provides that "[w]arranty coverage is automatically transferred at no cost to subsequent vehicle owners." BMW also offers extended warranties which consumers can purchase. BMW is therefore required to repair the Battery Cable Defect on the Class Vehicles.

153.   BMW has breached this express warranty because it has failed to remedy the Battery Cable Defect.

154.  Plaintiff Gujral and the Connecticut Class members relied on the warranties above, both about the condition of the Class Vehicles and the availability of repair, in making their decisions to purchase or lease the Class Vehicles. Plaintiff Gujral and the Connecticut Class members have fulfilled all of their obligations under any contract with BMW or have otherwise been excused from doing so by the breach herein.

155. As a direct and proximate result of BMW's false and misleading representations and warranties, Plaintiff Gujral and the Connecticut Class members suffered significant damages as described herein.

156. As the manufacturers, suppliers, and/or sellers of the Class Vehicles, BMW had actual knowledge of the Battery Cable Defect and the breach of warranties. It issued the Safety Recalls concerning the Battery Cable Defect, only with respect to certain models and years, acknowledging they were unsafe, and it knew it had made warranties to the contrary. It also had actual knowledge of the Battery Cable Defect and its breaches of warranties due to a host of warranty claims, consistent consumer complaints and reports from its own dealers and field technicians.

157.  As a result of BMW's breach of its express warranties, Plaintiff Gujral and the Connecticut Class members have been damaged in an amount to be determined at trial.

## EIGHTH COUNT

### (Breach of Implied Warranty under Connecticut Law)

158. Plaintiff, Gujral, on behalf of himself, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

159. Plaintiff brings this claim individually and on behalf of a Class of Connecticut residents who formerly or currently own or lease one or more of the Class Vehicles, in the event the Court declines to certify a nationwide class under New Jersey law.

160. BMW, as the designer, manufacturer, marketer, distributor, and/or seller of high quality performance vehicles impliedly warranted that the Class Vehicles, and the cables connecting the battery were fit for their intended purpose in that they would be safe and functional.

161. BMW breached the warranty implied in the contract for the sale/lease of the Class Vehicles in that the Class Vehicles could not pass without objection in the trade under the contract description, the goods were not of fair, average quality within the description, and the Class Vehicles were unfit for their intended and ordinary purpose in that battery cable connectors did not function properly and exposed Class members to a risk that they might cause electrical problems, impacting the vehicles

operation or even cause a fire. As a result, Plaintiff Gujral and the Connecticut Class members did not receive the goods as impliedly warranted by BMW to be merchantable.

162.   Plaintiff Gujral and members of the Connecticut Class are the intended beneficiaries of BMW's implied warranties.

163.   In reliance upon BMW's skill and judgment and the implied warranties, Plaintiff Gujral and members of the Connecticut Class purchased or leased the Class Vehicles for use as safe transportation that would not result in causing the vehicle to malfunction and/or pose a fire hazard.

164.   Plaintiff Gujral and members of the Connecticut Class did not alter the Class Vehicles and/or use them in an unintended manner.

165.   The Class Vehicles were defective when they left the exclusive control of BMW. The defective battery cables at all times pose an unreasonable risk of failing or fire, as described above, exposing the passengers to serious bodily harm.

166.   The Class Vehicles were defectively designed and/or manufactured and unfit for their intended purpose, and Class members did not receive the goods as warranted.

167.   As a direct and proximate cause of BMW's breach of the implied warranty, Plaintiff Gujral and members of the Connecticut Class have been damaged in an amount to be determined at trial.

### NINTH COUNT

**(Breach of Implied Warranty under North Carolina law)**

168. Plaintiff, Emerson, on behalf of herself and all similarly situated persons, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

169. Plaintiff brings this claim individually and on behalf of a Class of North Carolina residents who formerly or currently own or lease one or more of the Class Vehicles, in the event the Court declines to certify a nationwide class under New Jersey law.

170. BMW Vehicles were subject to an implied warranty of merchantability and an implied warranty of fitness for a particular purpose, as described herein.

171. Under North Carolina common and statutory law, a warranty of merchantability and a warranty of fitness for a particular purpose are implied in all sales transactions where the seller has reason to know the particular purpose for which the product is to be used and that the consuming public is relying on the skill or judgment of the seller to furnish a suitable product. A warranty of merchantability is a warranty implied by law that a product is fit for the ordinary purposes for which it is used, is properly labeled and conforms to the representations made about it. See

N.C. Gen. Stat. § 25-2-314. A warranty of fitness for a particular purpose is a warranty implied by law that a product is fit for its intended use. See N.C. Gen. Stat. § 25-2-315.

172. BMW breached the implied warranties in the manner described above.

173. The implied warranties were part of the basis of the bargain at the time of sale, as required by federal and state law.

174. Plaintiff, Emerson, and other Class members have been damaged by BMW's breaches of the implied warranties in the manner described above.

175. Any limitation period, limitation on recovery or exclusions of implied warranties are unconscionable within the meaning of Section 2-302 of the Uniform Commercial Code and, therefore, are unenforceable, in that, among other things, 1) Defendant knew of should have known of the latent defect arising through the use of the defective battery cable connection and 2) Plaintiff and members of the Class lacked a meaningful choice with respect to the terms of the limitation on implied warranties due to unequal bargaining power and a lack of warranty competition. See N.C. Gen. Stat. § 25-2-302.

## TENTH COUNT

(Violation of the North Carolina Unfair or Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.)*

176. Plaintiff, Emerson, on behalf of herself and all similarly situated persons, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

177. Plaintiff brings this claim individually and on behalf of a Class of North Carolina residents who formerly or currently own or lease one or more of the Class Vehicles, in the event the Court declines to certify a nationwide class under New Jersey law.

178. Defendant BMW sold Vehicles, which were manufactured or assembled with defective battery cable connections, to Plaintiff and the Class with knowledge that the Vehicles were defective.

179. The defects in Defendant BMW's Vehicles were latent and not discoverable by reasonably diligent consumers.

180. Despite its knowledge of the defects, Defendant BMW failed to disclose the existence of the defects to Plaintiff and the Class.

181. Despite its knowledge of the defects, Defendant BMW continued to sell its Vehicles with defective battery cable connections to consumers subject to unconscionably limited express and implied warranties.

182. Defendant BMW's conduct as described herein was deceptive and unfair to consumers. Defendant BMW's failure to disclose the defects to consumers and its after-the-fact interpretation of its warranties had the capacity and tendency to

deceive. Defendant BMW's failure to disclose-and its attempts to conceal-the defects to consumers was immoral, unethical, unscrupulous and substantially injurious to consumers. *See Walker v. Fleetwood Homes of N.C.,* 627 S.E.2d 629, 631-32 (N.C. Ct. App. 2006).

183. Defendant BMW's knowingly deceptive and unfair conduct constitutes a breach of warranty with substantial aggravating circumstances under the North Carolina Unfair or Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* See *Walker,* 627 S.E.2d at 632.

184. As a direct and proximate result of BMW's violation of the Unfair or Deceptive Trade Practices Act, Plaintiff and the Class have suffered damages.

## ELEVENTH COUNT

### (Unjust Enrichment)

185. Plaintiffs, on behalf of themselves, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

186. This claim is brought on behalf of the Nationwide Class, Fire Subclass, Connecticut Subclass and North Carolina Subclass.

187. The warranty had value for which Plaintiffs and the proposed Class members paid, and for which Defendant agreed to render services of repair and replace.

188.   The Defendant breached its implied and express warranties in that Class Vehicles were defective with respect to engine materials, workmanship, and manufacture.   The Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of engine materials, workmanship, and manufacture defects.

189.   The Defendant benefited financially from its breaches of warranty, misrepresentations and fraud as described in this complaint.   The Defendant denied legitimate Class Vehicle engine warranty claims and obtained further unwarranted financial gain.

190.   Plaintiffs and the Class members sustained monetary damages as described in this complaint.

191.   Allowing the Defendant to retain its monetary enrichment from its wrongful and unlawful acts would be unjust and inequitable.

192.   Plaintiffs and the Class members request that the Defendant disgorge its profits from its wrongful and unlawful conduct and that the Court establish a constructive trust funded by the benefits conferred upon the defendant as a result of its wrongful conduct.   Plaintiffs and the Class members should be designated beneficiaries of the trust and obtain restitution for out of pocket expenses caused by the defendant's conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the Nationwide Class, Fire Subclass and Connecticut and North Carolina Subclasses, prays for judgment against BMW North America, LLC and Bayerische Motoren Werke Aktiengesellschaft granting the following relief:

1.    Certification of the proposed Nationwide Class, Fire Subclass, Connecticut and North Carolina Subclasses and appointing Plaintiffs to represent the Classes and Plaintiffs' counsel as class counsel;

2.    All recoverable compensatory, statutory and other damages sustained by Plaintiffs and the other members of the Nationwide Class, Fire Subclass, Connecticut and North Carolina Subclasses;

3.    Restitution and disgorgement of all amounts obtained by BMW as a result of its misconduct, together with interest thereon, from the date of payment, to the victims of such violations;

4.    Actual, treble, and/or statutory damages for injuries suffered by Plaintiff and the other members of the Nationwide Class, Fire Subclass, Connecticut and North Carolina Subclasses in the maximum amount permitted by applicable law;

5.    Statutory pre-judgment and post-judgment interest on the Class damages;

6.   Injunctive and declaratory relief;

7.   Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

8.   Such other relief as the Court may deem just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all causes of action so triable.

NAGEL RICE, LLP
*Attorneys for Plaintiffs and the Putative Class*

By: /s/ *Bruce H. Nagel*
    Bruce H. Nagel
    Randee M. Matloff
    103 Eisenhower Parkway
    Roseland, New Jersey 07068
    973-618-0400
    bnagel@nagelrice.com
    rmatloff@nagelrice.com

    Joseph Santoli, Esq.
    340 Devon Court
    Ridgewood, New Jersey 07450
    201-926-9200
    josephsantoli@aol.com

Dated: November 21, 2019